**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| CERTIFIED MOVING & STORAGE COMPANY, LLC; CERTIFIED INSTALLATION SERVICES, LLC,<br>　　　　Plaintiffs,<br><br>vs.<br><br>APPLIED UNDERWRITERS, INC., APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC,; and CONTINENTAL INDEMNITY COMPANY,<br>　　　　Defendant. | Case No.  8:21cv427<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Certified Moving & Storage Company, LLC and Certified Installation Services, LLC (collectively "Certified") hereby complains of defendants Applied Underwriters, Inc., Applied Underwriters Captive Risk Assurance Company, Inc. and Continental Indemnity Company (collectively "Applied"), and alleges as follows:

## NATURE OF THIS LAWSUIT

1.　For more than three decades, Certified has provided relocation, furniture delivery and installation, as well as warehousing services to the corporate community.

2.　Given its heavy reliance on a large labor force, Certified sought to obtain a workers' compensation program that would help it control and limit its workers' compensation costs.

3.　Offering businesses like Certified what appeared to be a solution for these concerns, Applied actively solicited Certified's business and, eventually, sold

1

Certified a workers' compensation insurance program that included a "Reinsurance Participation Agreement" ("RPA").

4. In marketing and soliciting Certified's business, Applied represented that its program offered Certified a way to "share in the underwriting results" of Applied's workers' compensation insurance program, and even obtain profits on its "investment."

5. Unfortunately, the financial projections that Applied used to entice Certified into joining the program were highly misleading.

6. As New York's insurance regulator noted about Applied's program, in general, "The formula by which the [the program] calculate[s] costs was complex and the way in which it was presented to employers was misleading. When offered the Program, employers were given a visual representation that showed their lowest and highest possible costs, but that did not give an indication of what their total payments might be."

7. Likewise, the Illinois Department of Insurance noted that, "the RPAs lacked standard information about premium amounts, used complex and confusing calculations for costs, including deposits and premiums due."

8. Similarly, the Vermont Department of Financial Regulation found that Applied sold "programs were misleadingly characterized as both a "profit sharing" arrangement and a valid reinsurance transaction."

9. Indeed, at the conclusion of Certified's involvement in the program, when it came time to make any final adjustments and to return monies to Certified, Certified was told that it would receive $750,000 less than the amount Applied had presented to Certified in its marketing materials when Applied was trying to entice Certified to participate in the program.

10. By this lawsuit, Plaintiffs seek: (1) damages for breach of contract; (2) fraudulent inducement to contract (3) damages for fraudulent misrepresentation;

(4) damages for negligent misrepresentation; and (5) declaratory relief under 28 U.S.C. § 2201 confirming that it is entitled to the amounts claimed under the RPA.

## THE PARTIES

11. Plaintiff Certified Moving & Storage Company, LLC is a New York corporation with its principal place of business at 286 Madison Avenue, New York, New York.

12. Plaintiff Certified Installation Services, LLC is a New York corporation with its principal place of business at 286 Madison Avenue, New York, New York.

13. Certified is informed and believes, and on that basis alleges that Applied Underwriters Inc., is a Nebraska corporation with a principal place of business at 10805 Old Mill Road, Omaha, Nebraska.

14. Certified is informed and believes, and on that basis alleges that Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA") is a property casualty company incorporated in Iowa, with a principal place of business at 10805 Old Mill Road, Omaha, Nebraska.

15. Applied represents to the public:

> Applied's story starts with workers' compensation insurance. We took a difficult, heavily regulated line of insurance, made it our singular focus, and made it better. We did this by first learning its intricacies and the very real human risk it addresses. We then used that insight to help our customers better manage their risk.

https://www.auw.com/about-us

16. Continental Indemnity Company ("Continental") is an insurance company incorporated in Iowa, with a principal place of business at 10805 Old Mill Rd, Omaha, Nebraska. Continental is an indirect subsidiary of Applied Underwriters, Inc.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction to hear this case pursuant to 28 U.S.C. § 1332 based on complete diversity of the parties and an amount in controversy exceeding the sum of $75,000.000, exclusive of costs and interest.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

19. Venue is also proper, pursuant to the RPA which provides, as follows:

> ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF, RELATED TO OR BASED UPON THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MUST ONLY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF NEBRASKA, IN EACH CASE LOCATED IN OMAHA AND THE COUNTY OF DOUGLAS, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUIT.

Ex. B at pg. 7-8.

## APPLIED SELLS CERTIFIED ON AN "INVESTMENT"

### Applied's Scheme

20. Applied designed, offered, marketed, and sold workers' compensation insurance programs including the "EquityComp" program.

21. The program included workers compensation insurance policies sold by Continental Indemnity Company ("Continental"), along with another contract entitled a "Reinsurance Participation Agreement" ("RPA").

22. The RPAs established a loss-sensitive formula (whereby costs go up when claims increase), which modified and superseded the agreements with Continental.

23. The RPAs also required employers to fund a segregated cell from which the insurer's losses would be paid subject to a minimum and maximum estimated at the inception of each program.

24. As set forth in the RPAs, because the RPAs required the employer to fund the segregated cell, the terms of the RPAs controlled the amount of the employers' monthly payments regardless of any other arrangements.

25. In fact, officers of Applied had obtained a patent for a "Reinsurance Participation Plan," the formula used in the RPA.

26. The patent explicitly states that its purpose is to introduce a novel premium structure into the marketplace enabling the offering of retrospective-style insurance to small and medium-sized insureds and described the program as "a reinsurance based approach to providing non-linear retrospective plans to insureds…while at the same time complying with state regulation."

27. A number of states, including New York, New Jersey, Illinois, Vermont and California have found that the program does not comply with state insurance regulations.

### The Pitch

28. To lure Certified into entering into such a program, Applied provided Certified with a Workers' Compensation Program Summary & Scenarios sheet that it had prepared (the "Summary"). A true and correct copy of the Workers' Compensation Program Summary & Scenarios sheet, prepared on September 30, 2014, is attached hereto as Exhibit A.

29. The first paragraph of the Summary provides that "[t]his program is effected through a separate reinsurance transaction issued in conjunction with a fully insured, guaranteed cost, workers' compensation policy and only your own individual claims experience will be used in determining your final cost."

30. The Summary also provides that "[b]ased on your individual claims experience, this program can provide intermediate cash flow benefits and financial reward unlike other plans that require waiting for cumbersome retrospective or uncertain dividend calculations that can run for years beyond policy expiration."

31. The Summary includes "Presentation Highlights" such as low pay-in factors with monthly calculations to provide up-front savings and easy cash flow.

32. The Summary also includes "Final Cost at Various Claims Cost Levels" and contains a table providing a "Final Cost: associated with an "Ultimate Claims Cost." This information tied Certified's costs to its claims experience and gave Certified an understanding of how the program would work.

33. Per the Summary, Applied represented to Certified that if the "Ultimate Claims Cost" was between $1,050,000 and $1,200,000, the "Final Cost" to Certified would be between $2,775,168 and $2,851,362.

34. On October 1, 2014, relying on the marketing materials provided to it by Applied, Certified signed the RPA.

## The Contract

35. The RPA, as noted above, was part of the "profit sharing" plan that allowed Applied "to establish a segregated protected cell whereby [Certified] may share in the underwriting results of the Workers' Compensation policies of insurance issued for the benefit of [Certified] by the issuing Insurers." A true and correct copy of the RPA, dated October 1, 2014, is attached hereto as Exhibit B.

36. Applied calculated "loss development factors ("LDFs") for each loss under the Policies directly from the loss development factors published by the government rating bureau in the state where the exposure occurred. LDF's are subject to change without notice."

37. LDFs are used to adjust losses to account for claim increases. LDFs are numbers that adjust claims to their ultimate projected level. For example, an LDF of 2.0 means that for every $1 in claims, the ultimate payout will be $2.

38. Table A in Schedule 1 of the RPA provided a table of the "Loss Development Factors." According to Table A, Applied utilized a higher LDF for younger claims. Additionally, claims that were "open" had higher LDFs than claims that were "closed." And this formulation is logical, where a claim is older and/or closed, there is more certainty about the claim and less likelihood that what is reserved will not account for contingencies or changes, and thus less of a need to project a large amount of uncertainty. On the other hand, if a claim is open and younger, there is more uncertainty about where it will end up, and a greater likelihood that it will develop exponentially, requiring greater reserves.

39. Thus, according to Table A, an open claim that is 5 months old would have a monthly LDF of 3.251, while an open claim that is 35 months old would have an LDF of 2.524.

40. Applied's Table A only provided LDFs for claims 36 months or younger.

### Certified's Experience Under the Program

41. When an employee suffers a workplace injury or illness, a claim for workers compensation is made. Under the Policy and RPA, Applied managed Certified's workers' compensation program. Applied was responsible for investigating claims, paying out losses, establishing plans and projecting future costs of the claims.

42. Applied provided Certified with monthly Plan Analysis reports which showed, on a monthly basis: what was incurred; the status of the claims, and; what was owed.

7

43. Certified received a Plan Analysis on July 1, 2021, covering the period of May 1, 2021 to May 31, 2021. A true and correct copy of the Plan Analysis for the period of May 1, 2021 to May 31, 2021 (the "May 2021 Plan Analysis") is attached hereto as Exhibit C.

44. As reflected in the May 2021 Plan Analysis, over the course of the three-year program, Certified had a total of 17 claims, and a net total of $1,091,607 was incurred in connection with the claims.

45. The May 2021 Plan Analysis showed that all 17 claims were closed, meaning there is no reason to "project" a significant future for the claims.

46. There cannot be also no new claims coming in, and all of the existing claims –which were closed—were only getting older. No claim in the May 2021 Plan Analysis was younger than 44 months, and the oldest exceeded 79 months. At this point in time, the cost of these claims cannot change as they exceed the timeframe applicable under law to "re-open."

## Plan Closure

47. In response to Certified's request, on June 21, 2021, Applied sent Certified a proposal to close the program (the "Closing Proposal"), with the ultimate project claims cost listed as $1,699,879. A true and correct copy of the Closing Proposal is attached hereto as Exhibit D. The number was presented without explanation and was significantly higher than the actual net claims cost of $1,091,607 reflected in the May 2021 Plan Analysis that Applied had sent to Certified just three weeks prior.

48. As aforementioned, in Summary used to market the program, Applied represented to Certified that if the ultimate claims cost was between $1,050,000 and $1,200,000, the "Final Cost" to Certified would be between $2,775,168 and $2,851,362.

49. Although Certified has paid $3,616,324, and is entitled to payment of the difference between the amount paid and a final program cost within the range presented in Paragraph 48, Applied has only offered to pay a fraction of that difference.

## Applied Defends the Indefensible

50. On June 28, 2021, Certified responded to Applied's Closing Proposal stating that "the proposal lacks any measure of transparency," and requesting a detailed explanation of how Applied calculated the amounts due to Certified.

51. Having received an insufficient response, Certified was forced to hire counsel. Through counsel, on July 31, 2021, Certified wrote to Applied to request a review of the Closing Proposal – noting that Applied's Closing Proposal included a claims cost figure that was $600,000 higher than the May 2021 Plan Analysis, even though the former was generated just a few weeks after the latter and there was no change in claims.

52. On August 9, 2021, Applied's General Counsel wrote to Certified's counsel to dispute that any further payment was due, rejecting Certified's request.

53. Certified, through counsel, responded on August 31, 2021, pointing out that the Summary does not support Applied's calculations, and rejecting the notion that Certified should not rely on the very representations that Applied made in marketing the program.

54. On September 21, 2021, Applied, through its General Counsel, again rebuffed Certified's attempts at resolution.

55. To the extent waived or otherwise excused, Certified has complied with all terms and conditions in the RPA. Therefore, Certified is entitled to all benefits provided by the RPA.

## FIRST CAUSE OF ACTION

### (Breach of Contract against all Defendants)

56. Certified realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 55 above.

57. Certified performed all obligations required of it under the Policy, except as otherwise excused.

58. Applied breached its duties under the RPA by refusing to reimburse Certified.

59. As a direct and proximate result of Applied's acts, Certified has been damaged and will continue to sustain damages.

60. In addition, Certified has incurred and continues to incur consequential damages, including internal costs and attorneys' fees, due to Applied's wrongful, unjustified and unreasonable failure to issue payment of amounts due, all with the result of wrongfully diverting Certified from its business endeavors.

61. The consequential damages resulting from Applied's conduct were within the contemplation of the parties at the time the RPA was signed, as the natural and probable result of a breach of the RPA.

62. Certified's consequential damages were foreseeable given the purpose and particular circumstances of the workers' compensation program sold by the Applied.

63. As a result of Applied's breach, Certified requests entry of judgment for breach of contract, awarding payment of damages in an amount equal to the amount owed under the RPA and consequential damages, each in amounts to be proven at trial.

## SECOND CAUSE OF ACTION

### (Fraudulent Inducement against all Defendants)

64. Certified realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 63 above.

65. Applied fraudulently induced Certified to enter into the RPA which contained material misrepresentations of material facts, known by Applied to be untrue, with the intention of inducing Certified to rely upon them in purchase of the Policy and RPA.

66. Certified reasonably relied upon Applied's material misrepresentations and has suffered and will suffer additional monetary damages as a result of those misrepresentations.

67. As a result of Applied's fraudulent misrepresentation, Certified requests entry of judgment for fraudulent inducement, awarding payment of damages equal to the amount owed under the RPA in amounts to be proven at trial

## THIRD CAUSE OF ACTION

### (Fraudulent Misrepresentation against all Defendants)

68. Certified realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 67 above.

69. Applied fraudulently misrepresented the terms of the RPA to Certified and made material misrepresentations of material facts, known by Applied to be untrue, with the intention of inducing Certified to rely upon them in purchase of the Policy and RPA.

70. Certified reasonably relied upon Applied's material misrepresentations and has suffered and will suffer additional monetary damages as a result of those misrepresentations.

71. As a result of Applied's fraudulent misrepresentation, Certified requests entry of judgment for fraudulent misrepresentations, awarding payment of damages equal to the amount owed under the RPA in amounts to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation against all Defendants)

72. Certified realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 71 above.

73. As Certified's workers' compensation insurer, Applied had a duty to impart accurate and correct information about the RPA to Certified.

74. Applied negligently represented to Certified that they would be refunded any overpaid premiums to Certified.

75. Applied's negligent representation to Certified was materially false, as Applied has not returned all of Certified's overpaid premiums.

76. Certified reasonably relied upon Applied's representations in the Summary that if the ultimate claims cost was between $1,050,000 and $1,200,000, the "Final Cost" to Certified would be between $2,775,168 and $2,851,362.

77. Applied was in a special position of confidence and trust with Certified such that reliance on the negligent misrepresentation was justified.

78. As a result of Applied's negligent misrepresentations, Certified has suffered and will continue to suffer significant damages.

79. As a result of its negligent misrepresentation, Certified requests entry of judgment against Applied for negligent misrepresentation, awarding payment of damages in an amount equal to the amount owed under the RPA and consequential damages, each in amounts to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Declaratory Judgment against all Defendants)

80. Certified realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 79 above.

81. Pursuant to the terms of the RPA, Applied is obligated to pay Certified additional monies owed.

82. Applied disputes this and argues that it has fulfilled all its obligations under the contract to reimburse Certified.

83. Pursuant to 28 U.S.C. § 2201, Certified is entitled to a declaration by this Court of Applied's obligations under the RPA, including with respect to the meaning, scope, and application of provisions in the RPA including program closure and the application of LDFs.

84. An actionable and justiciable controversy exists between Certified and Applied concerning the interpretation and construction of the RPA, and the rights and obligations of the parties thereto, with respect to Certified's claim including with respect to the meaning, scope, and application of provisions in the RPA including program closure and the application of LDFs.

85. Pursuant to 28 U.S.C. § 2201, this Court should enter a declaratory judgment in favor of Certified and against Applied, declaring that Applied is obligated to return additional monies to Certified and, pursuant to 28 U.S.C. § 2202, any other relief this Court deems proper. Such a declaration would resolve the current controversy between Certified and Applied.

## PRAYER FOR RELIEF

WHEREFORE, Certified Moving & Storage Company, LLC and Certified Installation Services, LLC, pray for judgment as follows:

(a) On the First Cause of Action, Certified requests that the Court enter judgment against Applied, awarding Certified compensatory and consequential

damages in an amount to be determined at trial, but not less than $75,000;

(b) On the Second Cause of Action, Certified requests that the Court enter judgment against Applied in the form of restitution and equitable damages in an amount to be determined at trial;

(c) On the Third Cause of Action, Certified requests that the Court enter judgment against Applied, awarding Certified damages in an amount to be determined at trial, but not less than $75,000;

(d) On the Fourth Cause of Action, Certified requests that the Court enter judgment against Applied in the form of restitution and equitable damages in an amount to be determined at trial;

(e) On the Fifth Cause of Action, Certified requests that the Court enter a declaratory judgment in favor of Certified against Applied, declaring that Applied is required to reimburse Certified for the excess premium payments; and

(f) On all Causes of Action, Certified requests that the Court award costs, attorneys' fees in accordance with Neb. Rev. Stat. § 44-359, and pre- and post-judgment interest to the extent permitted by law, and such other, further, and different relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury in this action.

Dated: November 5, 2021

Respectfully submitted,

CERTIFIED MOVING & STORAGE COMPANY, LLC; CERTIFIED INSTALLATION SERVICES, LLC, Plaintiffs

By: s/ Rex A. Rezac
Rex A. Rezac, #17787
Brian Fahey, #25753
Fraser Stryker PC
500 Energy Plaza
409 South 17th Street
Omaha, NE 68102
Telephone: (402) 978-5238
RRezac@FraserStryker.com
BFahey@FraserStryker.com

Peter A. Halprin (*Pro Hac Vice Admission* to be filed)
Jeffrey L. Schulman (*Pro Hac Vice Admission* to be filed)
Stephen Wah (*Pro Hac Vice Admission* to be filed)
Pasich LLP
757 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 686-5000
PHalprin@PasichLLP.com
JSchulman@PasichLLP.com
SWah@PasichLLP.com

*Attorneys for Plaintiffs*