IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CERTIFIED MOVING & STORAGE COMPANY, LLC, and CERTIFIED INSTALLATION SERVICES, LLC,<br><br><br>Plaintiffs,<br><br><br>vs.<br><br><br>APPLIED UNDERWRITERS, INC., APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC., and CONTINENTAL INDEMNITY COMPANY,<br><br><br>Defendants. | **8:21-CV-427**<br><br><br><br>**MEMORANDUM AND ORDER ON MOTION TO DISMISS** |

## I.      INTRODUCTION

Certified Moving & Storage Company, LLC, and Certified Installation Services, LLC, (collectively, Certified), have sued Applied Underwriters, Inc. (Applied), Applied Underwriters Captive Risk Assurance Company, Inc. (AUCRA), and Continental Indemnity Company (Continental), for breach of contract, fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation. Certified also seeks declaratory judgment against Defendants stating that Certified is entitled to money from Defendants under the terms of a "Reinsurance Participation Agreement." Before the Court is Defendants' Motion to Dismiss. Filing 26. For the reasons stated herein, the Court grants in part and denies in part Defendants' Motion to Dismiss.

1

## II.    BACKGROUND

Plaintiffs, collectively referred to in this Order as Certified, are two New York companies specializing in relocation, furniture delivery and installation, and warehousing services to the corporate community. Filing 1 at 1. Because Certified relies heavily on its large labor force, it began searching for a workers' compensation program that would control and limit its workers' compensation costs. Filing 1 at 1. According to Certified, Defendants are three companies in the insurance business that offer the "EquityComp" workers' compensation insurance program. Filing 1 at 3–4.

The EquityComp program consists of two transactions with the plan participant. First, defendant Continental issues a guaranteed-cost workers' compensation insurance policy[1] to the participant to satisfy the participant's statutory obligation to maintain workers' compensation insurance for its employees. Filing 1 at 4; Filing 1-1 at 3. Defendant AUCRA, which had a "Reinsurance Treaty" and a pooling arrangement with several insurance companies, including Continental, reinsured the losses under the participant's insurance policy with Continental. Filing 1-2 at 6. Afterwards, the participant would enter into a "Reinsurance Participation Agreement" (RPA) with AUCRA, which modified and superseded the Continental insurance policy. Filing 1 at 4–5; Filing 1-1 at 3. The RPA governs what Defendants call a "profit sharing plan." Filing 1-2 at 3. Under the RPA, the participant funded a "segregated, protected cell"[2] maintained by AUCRA from which Continental's losses under the workers' compensation policy would be paid subject to a minimum and maximum estimated at the beginning of the EquityComp program. Filing 1 at 5;

---

[1] "Under a guaranteed cost policy, the premiums are fixed and usually do not change over the term of the policy." *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 913 F.3d 409, 412 (4th Cir. 2019) (citing Steven Plitt, Daniel Maldonado, Joshua D. Rogers, & Jordan R. Plitt, 2 Couch on Insurance § 69:10 (3d ed. 1995)).

[2] Each participant in the "profit sharing plan" had a separate cell with AUCRA that was not responsible for the debts and obligations of other participants' cells. Filing 1-2 at 6.

Filing 1-2 at 6. In general, the funds for the cell came from "capital deposits" by the participant equal to 10% of the Loss Pick Containment Amount—the expected losses—and a portion of the premiums paid by the participant under its insurance policy with Continental. Filing 1-2 at 11. AUCRA calculated "loss development factors" (LDFs) for each loss under the insurance policy that adjusted losses to account for claim increases. Filing 1 at 6–7; Filing 1-2 at 11. The LDFs adjusted a claim higher depending on the claim's age and whether it was open or closed. Filing 1 at 7; Filing 1-2 at 11, 13.

According to the RPA, this arrangement allowed the participant to share in the underwriting results of the workers' compensation insurance policy it had with Continental. Filing 1-2 at 6. Theoretically, the participant could save costs on its workers' compensation insurance through a refund of the money remaining in its segregated cell if its workers' compensation claims remained low during the term of the RPA. Filing 1 at 4; Filing 1-1 at 1–7. The dispute in this case is over how much Certified should have been reimbursed under this "profit sharing plan."

In 2014, Defendants marketed the EquityComp program to Certified. Filing 1 at 5; Filing 1-1 at 1–7; Filing 1-2 at 1–14. According to Certified, Defendants solicited Certified by providing a Workers' Compensation Program Summary & Scenarios (the Summary). Filing 1 at 5; Filing 1-1 at 2. The Summary touted the EquityComp program for providing intermediate cash flow benefits, offering a "Profit Sharing Opportunity" between the minimum and maximum cost of the program, and only using the participant's individual claims experience to determine the final cost. Filing 1-1 at 2–5. Additionally, the Summary included a table listing different final cost scenarios. Filing 1-1 at 7. In particular, the table stated that if the "Ultimate Claims Cost" was between $1,050,000 and $1,200,000 then the "Final Cost" to Certified would be between $2,775,168 and $2,851,362. Filing 1 at 6; Filing 1-1 at 7. Below the table was a disclaimer stating that the table

3

was only illustrative and based on client-provided historical claims data. Filing 1-1 at 7. The disclaimer further stated that the amounts were estimates only and that the actual amounts would vary depending upon the participant's future payroll and claims. Filing 1-1 at 7. Defendants also provided a quote to Certified for the EquityComp program. Filing 1-2 at 2–5. The quote stated that, based on Certified's annual payroll, the minimum estimated net cost to Certified was $1,105,716 and the maximum estimated net cost was $5,648,244 over the course of the active term of three years. Filing 1-2 at 3. The quote noted that the actual, final cost would be determined using the ultimate costs of the claims to the insurance policy along with factors and tables in the RPA. Filing 1-2 at 3.

On October 1, 2014, allegedly in reliance on the Summary provided by Defendants, Certified agreed to participate in the EquityComp program. Filing 1 at 6. Continental issued a workers' compensation insurance policy to Certified and Certified signed an RPA with AUCRA. Filing 1 at 4, 6. The RPA stated that it had an active term of three years that may be extended. Filing 1-2 at 7. Within the RPA is a table showing the LDFs that would apply to the losses under the insurance policy. Filing 1-2 at 13. The table listed LDFs for claims ranging from 0 to 6 months old all the way to claims 34 to 36 months old, and divided them into columns designated "Weekly," "Monthly," and "Run-Off." Filing 1-2 at 13. According to the RPA, the LDFs under the "Weekly" column would be used if Certified processed its payroll with an affiliate of AUCRA; the LDFs under the "Monthly" column would be used if Certified did not process its payroll with an AUCRA affiliate; and the LDFs in the "Run-Off" column would be used if Certified and AUCRA decided not to renew the EquityComp program within six months of the expiration of the active term. Filing 1-2 at 11.

During the program, Defendants provided Certified with monthly Plan Analysis reports. Filing 1 at 7. These reports showed costs incurred, claims statuses, and the amount owed. Filing 1 at 7; Filing 1-3 at 2–13. On July 1, 2021, Certified received a report covering the period from May 1, 2021, to May 31, 2021 (the May report). Filing 1 at 8; Filing 1-3 at 2–13. The May report showed that Certified had a total of 17 claims, which were all closed and over 36 months old. Filing 1 at 8; Filing 1-3 at 5. While the May report stated that the net incurred cost for the 17 claims was $1,091,607, it also stated that the total projected claims cost was $1,289,712. Filing 1-3 at 4–5, 13. Additionally, the May report showed that Certified's total payroll over the three-year term of the EquityComp program was $34,405,791, which was greater than the estimated annual payroll of $7,860,000 (which would presumably total $23,580,000 over three years) calculated before Certified entered the program. Filing 1-2 at 4; Filing 1-3 at 3.

On June 21, 2021, Certified requested a closing proposal from Defendants to end Certified's participation in the EquityComp program.[3] Filing 1 at 8; Filing 28-1 at 2–4. The proposal, which was sent a few weeks after the May report, listed the ultimate projected claims cost as $1,699,879. Filing 28-1 at 3. Certified believes this number is incorrect because it is much higher than the net incurred cost of $1,091,607 listed in the May report. Filing 1 at 8. Certified highlights that the Summary provided to Certified in Defendants' marketing materials stated that if Certified's Ultimate Claims Costs were between $1,050,000 and $1,200,000, the "Final Cost"

---

[3] In their Complaint, Certified stated that it had attached the closing proposal as "Exhibit D." Filing 1 at 8. However, Exhibit D is a copy of the quote for the EquityComp program provided by Defendants to Certified. Filing 1-4 at 1–7. Defendants attached a copy of the closing proposal to their Motion to Dismiss, Filing 28-1 at 1–4, which Certified does not dispute is a true and accurate copy. The Court may consider the closing proposal without converting the Motion to Dismiss into a summary-judgment motion, because the closing proposal is referenced in the Complaint; Certified believed it had attached it to the Complaint; and no one questions the authenticity of the copy of the closing proposal provided by Defendants. *See Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (holding that a court may consider documents "necessarily embraced by the pleadings" without converting a motion to dismiss into a summary-judgment motion and defining documents necessarily embraced by the pleadings as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." (quoting *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003))).

to Certified would be between $2,775,168 and $2,851,362. Filing 1 at 8; Filing 1-1 at 7. According to Certified, it is entitled to the difference of $3,616,324, which is the amount it has paid during the EquityComp program, and an amount between $2,775,168 and $2,851,362. Filing 1 at 9. Instead, the closing proposal states that Certified is owed $474,649 which, after subtracting a pending balance owed by Certified to Defendants, resulted in a refund of just $212,468.92. Filing 28-1 at 3.

Certified disputed the amounts listed in the closing proposal Defendants provided, alleging that the closing proposal lacked transparency. Filing 1 at 9. Specifically, Certified allegedly requested that Defendants explain how they arrived at the amounts due to Certified. Filing 1 at 9. Certified claims that it pointed out to Defendants that the Ultimate Claims Cost listed in the closing proposal, $1,699,879, was about $600,000 higher than the net incurred cost for the 17 closed claims listed in the May report. Filing 1 at 9.

After receiving responses from Defendants that it perceived to be inadequate, Certified filed suit on November 5, 2021. Filing 1. In its Complaint, Certified brings a breach-of-contract claim; fraudulent inducement and misrepresentation claims; and a negligent misrepresentation claim. Filing 1 at 10–12. Certified also seeks declaratory judgment stating that Defendants are obligated to return money to Certified. Filing 1 at 13. In general, Certified asserts that Defendants breached the RPA by not reimbursing them in accordance with representations made in the Summary and by improperly calculating Certified's reimbursement, and that Defendants misrepresented to Certified how it would be reimbursed under the EquityComp program. *See generally* Filing 1. On January 7, 2022, Defendants filed a Motion to Dismiss, arguing that Certified has failed to state a claim. Filing 26.

# III.   ANALYSIS

## A.  Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to satisfy this requirement, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Corrado v. Life Inv'rs Ins. Co. of Am.*, 804 F.3d 915, 917 (8th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In analyzing a motion to dismiss, the Court must "accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party, but [is] not bound to accept as true '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements' or legal conclusions couched as factual allegations." *McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015) (citations omitted) (quoting *Iqbal*, 556 U.S. at 678). "When considering a Rule 12(b)(6) motion, the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." *Ashford v. Douglas Cnty.*, 880 F.3d 990, 992 (8th Cir. 2018) (quoting *Smithrud v. City of St. Paul*, 746 F.3d 391, 395 (8th Cir. 2014)).

## B.  Certified's Breach-of-Contract Claim

In its breach-of-contract claim, Certified alleges that Defendants "breached [their] duties under the RPA by refusing to reimburse Certified." Filing 1 at 10. According to Certified,

Defendants breached the RPA by not reimbursing them in accordance with the table provided in the Summary. Filing 1 at 8–9. Certified further claims that Defendants improperly calculated the reimbursement to which Certified is entitled as shown by the fact that the ultimate claims cost in the closing proposal is significantly higher than the incurred losses shown in the May report. Filing 1 at 8–9. In their Motion to Dismiss, Defendants argue that two of the defendants, Continental and Applied, are not parties to the RPA and cannot be held liable for its breach. Filing 27 at 15–17. Defendants further argue that Certified fails to point to any provision in the RPA that Defendants allegedly breached, and that Certified cannot rely on the Summary to show that a breach of the actual agreement occurred. Filing 27 at 15–17; Filing 39 at 8–13. The Court concludes that Certified has failed to state a breach-of-contract claim against Continental and Applied but has stated a plausible claim against AUCRA.

1. *The Breach-of-Contract Claim Against Continental and Applied*

The Court begins with Certified's breach-of-contract claim against Continental and Applied. Certified's breach-of-contract claim alleges that Defendants breached their duties under the RPA. Filing 1 at 10. However, the only parties to the RPA, which is attached as an exhibit to Certified's Complaint, are Certified and AUCRA. Filing 1-2 at 6. Consequently, Defendants argue that Certified cannot bring a breach-of-contract action against Continental and Applied because they are not parties to the RPA. The Court agrees.

Documents attached to a complaint are considered along with allegations in the complaint. *See Katun Corp. v. Clarke*, 484 F.3d 972, 975 (8th Cir. 2007) ("When there are documents attached to the complaint, we consider this material along with the allegations in the complaint."); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Here, the RPA, which is attached to Certified's Complaint, shows

that Certified and AUCRA were the only parties to the RPA. *See N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454–55 (7th Cir. 1998) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."); *cf. Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 624 n.4 (8th Cir. 2021) (noting that an exhibit did not contradict the allegations made in a complaint). Therefore, Certified must provide some basis by which Continental and Applied can be held liable for breaching the RPA despite being nonsignatories.

Certified argues that it may hold Continental and Applied liable for breaching the RPA because they are beneficiaries to the RPA and both are affiliated with AUCRA, a signatory to the RPA. Filing 38 at 19–20. This argument is unpersuasive. As Defendants correctly point out, the third-party beneficiary doctrine is used by the third party to enforce its rights under a contract; it is not invoked against that third party to hold them liable under the contract. *See Equestrian Ridge Homeowners Ass'n v. Equestrian Ridge Ests. II Homeowners Ass'n*, 953 N.W.2d 16, 29 (Neb. 2021) ("Third-party-beneficiary theory is a common-law doctrine that allows a nonparty to a contract to enforce an interest owed by a promisor under the contract."). Therefore, for the purposes of holding Continental and Applied liable, it is irrelevant if Continental and Applied are third-party beneficiaries of the RPA.

Moreover, the fact that Certified alleges that Continental and Applied are affiliated with AUCRA is insufficient to hold them liable for breach of contract. The Court construes Certified's argument to mean that Continental and Applied can be held liable for AUCRA's alleged breach of the RPA by piercing the corporate veil. "The general rule is that a corporation will be looked upon as a separate legal entity until sufficient reason to the contrary appears . . . ." *Hayes v. Sanitary & Imp. Dist. No. 194 of Douglas Cnty.*, 244 N.W.2d 505, 511 (Neb. 1976). A sufficient reason to

disregard separate corporate existences appears when "one corporation is so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another corporation." *Id.* But nothing in Certified's Complaint alleges that Defendants are mere agencies, instrumentalities, adjuncts, or alter egos of each other. While the Complaint refers to Defendants collectively as "Applied," it does not allege that one corporation "totally dominated" the others to such an extent that the others "had no separate corporate existence and functioned solely to achieve the purposes of the dominant corporation." *Glob. Credit Servs., Inc. v. AMISUB (Saint Joseph Hosp.), Inc.*, 687, 508 N.W.2d 836, 843 (Neb. 1993). Merely alleging that one company is a parent and that the others are subsidiaries, or that they shared services, is insufficient. *See id.* at 842 ("[T]he doctrine of separate corporate existence does not break down merely because a corporation is a subsidiary, even if wholly owned by the parent . . . . To pierce the corporate veil between a parent and a subsidiary, a plaintiff must show more than the mere sharing of services between the two corporations."). The allegations in Certified's Complaint are insufficient to plausibly suggest that Continental and Applied can be held liable under a piercing-the-corporate-veil theory.

Continental and Applied are not parties to the RPA. Certified has not alleged facts to support their liability for breach of contract. Accordingly, the breach-of-contract claim against Continental and Applied is dismissed. *See Alder v. First Nat. Bank & Tr. Co. of Kearney*, No. A-90-332, 1992 WL 132257, at *3 (Neb. Ct. App. May 26, 1992) (dismissing defendant from breach-of-contract action who was not a party to the contract), *aff'd*, 491 N.W.2d 686 (Neb. 1992).

2. *The Breach-of-Contract Claim Against AUCRA*

In its breach-of-contract claim, Certified asserts that AUCRA "breached its duties under the RPA by refusing to reimburse Certified." Filing 1 at 10. As specified in the Complaint,

Certified takes issue with AUCRA providing an ultimate projected claims cost of $1,699,879 in the closing proposal. Filing 1 at 8. Certified points out that, a few weeks prior to receiving the closing proposal, AUCRA stated in the May 2021 report that the net total cost of the claims under Certified's workers' compensation policy was $1,091,607. Filing 1 at 8. Certified further contends that AUCRA also breached the RPA by not reimbursing Certified in accordance with statements made in the Summary used to market the EquityComp Program. Filing 1 at 8–9. While AUCRA did not breach the RPA by declining to use statements in the Summary to determine the final cost to Certified, the Court concludes that Certified has stated a breach-of-contract claim by alleging that AUCRA significantly raised the ultimate projected claims cost without explanation and in contravention of the RPA.

Nebraska law governs this contract dispute. *Schwan's Sales Enterprises, Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 595 (8th Cir. 2007) ("In diversity cases, we apply substantive state law."). "A breach of contract action consists of a promise, its breach, damages, and compliance with any conditions precedent." *Ryan v. Streck, Inc.*, 958 N.W.2d 703, 710–11 (Neb. 2021). The party seeking enforcement of a contract "has the burden of establishing the existence of a valid, legally enforceable contract." *Valley Boys, Inc. v. Am. Fam. Ins. Co.*, 947 N.W.2d 856, 867 (Neb. 2020).

Certified first contends that AUCRA breached the RPA by not using a table in the Summary to determine how much to reimburse Certified. But Certified has not pointed to any part of the RPA that obligates AUCRA to reimburse Certified in accordance with the amounts listed in the Summary's table. Rather, the RPA states that it will calculate the ultimate loss under Certified's insurance policies by multiplying the aggregate incurred loss by an applicable LDF. Filing 1-2 at 11. Table A in the RPA lists the applicable LDFs. Filing 1- at 11, 13. Thus, the terms of the RPA, not the Summary, show how Certified will "share in the underwriting results" of its insurance

policies. Filing 1-2 at 6. Nothing in the RPA mentions the Summary or incorporates it by reference. *Cf. Baker's Supermarkets, Inc. v. Feldman*, 502 N.W.2d 428, 432 (Neb. 1993) (reading the original lease and a supplemental agreement as integrated where the supplemental agreement stated that the original lease was "by this reference deemed incorporated").

Moreover, to the extent Certified argues that the Summary was a separate promise by AUCRA to use the statements in the Summary to determine the final cost to Certified, nothing in Certified's Complaint claims that AUCRA made such a promise. *See Valley Boys*, 947 N.W.2d at 867 (holding that the party wanting to enforce a contract has the burden of establishing that a valid, legally enforceable contract exists); *Logan Ranch, Karg P'ship v. Farm Credit Bank of Omaha*, 472 N.W.2d 704, 709 (Neb. 1991) (noting that an express contract requires a "definite proposal and an unconditional and absolute acceptance"). Certified vaguely claims that it has pled the existence of a promise, citing the portion of its Complaint stating that AUCRA "represented to Certified [in the Summary] that if the ultimate claims cost was between $1,050,000 and $1,200,00, the "Final Cost" to Certified would be between $2,775,168 and $2,851,362." Filing 1 at 8. This alleged representation comes from a portion of the Summary that includes a table listing the ultimate claims cost and the corresponding final cost to Certified. Filing 1-1 at 7. However, the Summary was a promotional tool—a fact Certified acknowledged in its Complaint, Filing 1 at 8— that disclaimed any ability to change the terms of the RPA. Filing 1-1 at 7; *see Exeter Bancorporation, Inc. v. Kemper Sec. Grp., Inc.*, 58 F.3d 1306, 1311 (8th Cir. 1995) (noting, under Minnesota law, that a promotional brochure could not be interpreted as a promise "since it was obviously an advertisement and contained only the most general information about [the defendant's] background and structure"). Nothing in the Summary purports to make a promise on behalf of AUCRA. *See Harmon Cable Commc'ns of Nebraska Ltd. P'ship v. Scope Cable*

12

*Television, Inc.*, 237 Neb. 871, 882, 468 N.W.2d 350, 359 (1991) (defining a promise as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." (quoting Restatement (Second) of Contracts § 2(1))). Accordingly, the contention that AUCRA breached the RPA by declining to use the statements in the Summary to determine the final cost to Certified under the EquityComp is insufficient to support an actionable claim here.

Nevertheless, the Court concludes that Certified's Complaint states a breach-of-contract claim by alleging that AUCRA miscalculated Certified's reimbursement pursuant to the RPA's terms. The RPA delineates in a few provisions how to calculate the ultimate cost of workers' compensation claims under Certified's insurance policy. Filing 1-2 at 11–13. As outlined in Certified's Complaint, the May report stated that the net total incurred through the seventeen workers' compensation claims made on Certified's insurance policy was $1,091,607. Filing 1 at 8. The May report adjusted the net total cost by applying LDFs to reach a total projected claims cost of $1,289,712. Filing 1-3 at 5. A few weeks later, in the June 21, 2021 closing proposal, AUCRA stated that the ultimate projected cost was $1,699,879, which is significantly higher than the projected cost reflected in the May 2021 report. Filing 1 at 8; Filing 37-6 at 3. Nothing in the closing proposal explains how AUCRA calculated the ultimate projected cost of the claims, nor how it determined how the amount of the reimbursement to which Certified was entitled. Accordingly, the Court concludes that, at the pleading stage, Certified has stated a plausible breach-of-contract claim by alleging facts that plausibly suggest that AUCRA inaccurately calculated the ultimate projected cost in the closing proposal in contravention of the terms in the RPA.

AUCRA attempts to resist this conclusion by arguing that Certified's breach-of-contract allegations are too generalized and conclusory to state a claim because Certified does not point to a specific provision in the RPA breached by AUCRA. Filing 27 at 16. AUCRA relies on a footnote in the Eighth Circuit Court of Appeals decision in *Gillis v. Principia Corp.*, 832 F.3d 865 (8th Cir. 2016), for the proposition that "[i]n breach of contract actions, . . . the complaint must, at minimum, cite the contractual provision allegedly violated. Generalized allegations of a contractual breach are not sufficient." 832 F.3d at 872 n.11 (alteration in original) (quoting *Cummins Law Office, P.A. v. Norman Graphic Printing Co.*, No. CIV. 11–2061 RHK/FLN, 2012 WL 3430447, at *3 (D. Minn. Aug. 14, 2012)). But *Gillis* involved a plaintiff alleging that the defendant violated promises purportedly made in five separate documents. *Id.* at 872–73. Contrary to the "scattershot allegations" at issue in *Gillis*, *id.* at 872, Certified has clearly articulated that AUCRA failed to calculate the ultimate projected cost of the claims under the terms of the RPA. Rather than alleged promises spanning five documents, the terms Certified alleges that AUCRA violated come from a few provisions in the RPA governing how to calculate the ultimate cost of workers' compensation claims. Therefore, *Gillis* does not prevent this Court from determining that Certified's breach-of-contract claim survives Defendants' Motion to Dismiss and may proceed to discovery.

## C.  Certified's Fraudulent-Inducement, Fraudulent-Misrepresentation, and Negligent-Misrepresentation Claims

The Court addresses Certified's fraudulent-inducement, fraudulent-misrepresentation, and negligent-misrepresentation claims together, because they have similar elements and the parties address them together in their briefs. In the interests of brevity, the Court will refer to these claims collectively as Certified's "misrepresentation claims." According to Certified, Defendants represented to Certified in the Summary that "if the ultimate claims cost was between $1,050,000

and $1,200,000, the "Final Cost" to Certified would be between $2,775,168 and $2,851,362."[4] Filing 1 at 8. This alleged representation comes from a table presented in the Summary that lists the "Ultimate Claims Cost" with a corresponding "Final Cost." Filing 1-1 at 7. For example, the table states that if the "Ultimate Claims Cost" is $1,200,000, the "Final Cost" will be $2,851,362. Filing 1-1 at 7. Certified claims that, despite this alleged representation, Defendants declined to reimburse Certified in accordance with the table in the Summary. Filing 1-1 at 8–9. Importantly, below the table is a disclaimer stating that the tables "are for illustrative purposes only and are based on client provided historical claims data." Filing 1-1 at 7. The disclaimer continues, "The amounts shown are estimates only. Actual amounts will vary depending upon your future payroll and claims, which cannot be determined now with certainty." Filing 1-1 at 7.

The Court first addresses Defendants' argument that Certified failed to file its misrepresentation claims within the applicable statute of limitations. Certified's misrepresentation claims have a limitations period of four years. Neb. Rev. Stat. § 25-207 (providing statute of limitations for fraud claims and actions for any "injury to the rights of the plaintiff, not arising on contract, and not hereinafter enumerated . . . ."); *see also Keith v. Data Enterprises, Inc.*, 925 N.W.2d 723, 732 (Neb. Ct. App. 2019) ("The statute of limitations for . . . negligent misrepresentation is 4 years."). In fraud claims, the statute begins to run upon "discovery of the fraud." Neb. Rev. Stat. § 25-207 (providing that the cause of action of fraud "shall not be deemed to have accrued until the discovery of fraud"). In negligent misrepresentation claims, the statute

---

[4] Certified also vaguely references the findings from several state regulatory agencies about the EquityComp program being "complex," "confusing," or "misleading." Filing 1 at 2. According to Certified, the findings of some state regulators may be relevant to show that Defendants engaged in "misleading activities" while running the EquityComp program. Filing 38 at 25 n.2. The only representation that Certified relies upon for its misrepresentation claims, however, is the alleged representation in the Summary.

usually begins to run "as soon as the act or omission occurs." *Shlien v. Bd. of Regents, Univ. of Nebraska*, 640 N.W.2d 643, 650 (Neb. 2002).

The Court first concludes that Certified's fraud-based misrepresentation claims are not time-barred. Although Certified alleges that Defendants made fraudulent misrepresentations in the Summary, the purportedly fraudulent nature of these misrepresentations did not become apparent to Certified until it received the closing proposal on June 21, 2021. Filing 1 at 8; Filing 28-1 at 2–4. At that point, Certified allegedly became aware that their total costs under the EquityComp program exceeded what had been allegedly represented to them in the Summary. Accordingly, the "discovery of the fraud" occurred on June 21, 2021, which is within the four-year statute of limitations.

The Court also concludes that the negligent misrepresentation claim is timely.[5] Defendants argue that because the allegedly negligent misrepresentation occurred when they presented Certified with the Summary in 2014, then the four-year statute of limitations began to run in 2014 and expired before Certified filed this suit in 2021. Filing 27 at 24. However, as the Nebraska Supreme Court recognized in *Shlien v. Board of Regents, University of Nebraska*, when an individual is "wholly unaware that he or she has suffered an injury or damage" it would be unjust to begin the statute of limitations period "before a claimant could reasonably become aware of the injury." 640 N.W.2d 643, 650 (Neb. 2002). *Shlien* dealt with a tort claim under the Nebraska State Tort Claims Act. *Id.* at 648. In holding that the plaintiff's tort claim was timely, the Nebraska

---

[5] Certified attempts to show that its negligent misrepresentation claim is timely because Defendants subjected it to "a continuing, cumulative pattern of tortious conduct," which means that "the statute of limitations [did] not run until the date of the last injury or cessation of the wrongful conduct." Filing 38 at 31 (quoting *Alston v. Hormel Foods Corp.*, 730 N.W.2d 376, 381 (Neb. 2007)). According to Certified, the last date of its injury occurred on June 21, 2021, when it received the closing proposal. Filing 38 at 31. This argument is not persuasive. Certified's complaint does not allege a continuing pattern of tortious conduct; it alleges one instance of negligent misrepresentation that occurred in 2014 when it received the Summary. Thus, the "continuing tort doctrine" is inapplicable. Nevertheless, the Court determines that Certified's negligent misrepresentation claim is timely on other grounds.

Supreme Court held, "[I]n a case where the injury is not obvious and is neither discovered nor discoverable within the limitations period running from the wrongful act or omission, the statute of limitations does not begin to run until the potential plaintiff discovers, or with reasonable diligence should have discovered, the injury." *Id.* at 650. Like the tort claim in *Shlien*, negligent misrepresentation is also a tort. *See Tolliver v. Visiting Nurse Ass'n of Midlands*, 771 N.W.2d 908, 914 (Neb. 2009) (describing misrepresentation as a tort). Therefore, the rule from *Shlien* applies in this case.

Here, the injury to Certified from Defendants' alleged negligent misrepresentation would not have been obvious at the time Certified received the Summary. Moreover, the injury to Certified would not have been discovered until Defendants presented Certified with the closing proposal on June 21, 2021. At that time, Certified would have realized that its total costs under the EquityComp program were significantly higher than what Defendants allegedly represented in the Summary. Accordingly, Certified's negligent misrepresentation claim is not time-barred.

Having concluded that Certified's misrepresentation claims are timely, the Court turns to Defendants' other arguments in support of dismissal. Defendants argue that Certified's misrepresentation claims must be dismissed for failure to comply with Federal Rule of Civil Procedure 9(b). Filing 27 at 18–19. Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake . . . ." Fed. R. Civ. P. 9(b). According to Defendants, Certified violated Rule 9(b) because it has not identified any specific action that each Defendant took or any specific misrepresentation that each Defendant made. Filing 27 at 19. Similar to its argument in support of its breach-of-contract claim, Certified argues that because Applied and Continental are beneficiaries of the RPA, to which AUCRA is a signatory, it

17

has put all three Defendants on notice and satisfied Rule 9(b)'s particularity requirement. Filing 38 at 23.

The Court has serious doubts that merely alleging that two of the defendants are beneficiaries to an agreement is sufficient to meet Rule 9(b)'s particularity requirement. Such an allegation does not explain which defendant or defendants made what allegedly fraudulent statements nor the time, place, or content of those fraudulent statements. *See Ascente Bus. Consulting, LLC v. DR myCommerce*, 9 F.4th 839, 845 (8th Cir. 2021) (noting that for each fraud-based claim, the plaintiff "needed to 'plead the 'who, what, where, when, and how[.]'" (alteration in original) (quoting *Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*, 949 F.3d 417, 421 (8th Cir. 2020))); *see also Ambassador Press*, 949 F.3d at 421 (stating a complaint alleging fraud must plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." (quoting *Schaller Tel. Co. v. Golden Sky Sys. Inc.*, 298 F.3d 736, 746 (8th Cir. 2002))). The Complaint does not explain which defendant did what action that makes up Certified's misrepresentation claims, and merely referring to them collectively as "Applied" in the Complaint is insufficient to plead that all Defendants are the same entity for the purposes of Certified's misrepresentation claims.

Nevertheless, the Court need not decide whether Certified's Complaint complies with Rule 9(b), because there is a more fundamental flaw with its misrepresentation claims. Certified's Complaint alleges that Defendants made misrepresentations in the Summary that Defendants used to market the EquityComp program. Filing 1 at 8. Defendants argue that the alleged representations in the Summary cannot be the basis of Certified's misrepresentation claims because they are

predictions of future events, which, as a matter of law, are not statements of fact. Filing 27 at 19–20.

> A prima facie case of fraudulent misrepresentation requires:
>
> (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that it should be relied upon; (5) that the party reasonably did so rely; and (6) that he or she suffered damage as a result.

*Eicher v. Mid Am. Fin. Inv. Corp.*, 748 N.W.2d 1, 12 (Neb. 2008). Fraudulent inducement "goes to the means used to induce a party to enter into a contract" and occurs "if the party's consent was obtained by false representations." *Gonzalez v. Union Pac. R.R. Co.*, 803 N.W.2d 424, 442 (Neb. 2011). Similar to fraudulent misrepresentation and fraudulent inducement claims, to state a claim for negligent misrepresentation a plaintiff must allege:

> (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that the representation was made with the intention that the plaintiff should rely on it; (5) that the plaintiff did so rely on it; and (6) that the plaintiff suffered damage as a result.

*Zawaideh v. Nebraska Dep't of Health & Hum. Servs. Regul. & Licensure*, 825 N.W.2d 204, 212 (Neb. 2013). "Negligent misrepresentation has essentially the same elements as fraudulent misrepresentation with the exception of the defendant's mental state." *Id.*

Defendants' argument attacks elements one and two of Certified's misrepresentation claims: that Certified made a representation that was false. "To constitute a false representation, a statement must be made as a statement of fact, not merely the expression of an opinion." *Kliewer v. Wall Const. Co.*, 429 N.W.2d 373, 380 (Neb. 1988). "A fraudulent statement relates to a 'present or preexisting fact.'" *Fast Ball Sports, LLC v. Metro. Ent. & Convention Auth.*, 835 N.W.2d 782, 791 (Neb. Ct. App. 2013) (quoting *Linch v. Carlson*, 56 N.W.2d 101, 105 (Neb. 1952)). Therefore,

in general, "fraud cannot be based on predictions or expressions of mere possibilities in reference to future events." *NECO, Inc. v. Larry Price & Assocs., Inc.*, 597 N.W.2d 602, 606 (Neb. 1999).

The table in the Summary, which the disclaimer identifies as estimates based on the historical claims data provided by Certified, is not a false representation capable of supporting Certified's misrepresentation claims. The alleged misrepresentation must relate to a "present or preexisting fact." *Linch*, 56 N.W.2d at 105. Certified characterizes the table in the Summary as a representation by Defendants of what Certified's final cost *will be* under the EquityComp Program. Filing 1 at 8; Filing 38 at 24. But the estimates provided in the Summary are projections based on Certified's claims history of what, in the future, Certified's final costs *may be*. As the disclaimer indicates, the actual amounts charged to Certified "will vary depending upon [Certified's] future payroll and claims, which cannot be determined now with certainty." Filing 1-1 at 7. The estimates in the summary are not statements of facts; they are "predictions . . . in reference to future events." *NECO*, 597 N.W.2d at 606. Because Certified has based its misrepresentation claims on estimates of what Certified's final costs may be in the future, it has failed to allege that Defendants made a false representation.[6] Therefore, the Court grants Defendants' Motion to Dismiss on Certified's fraudulent-misrepresentation, fraudulent-inducement, and negligent-misrepresentation claims.

---

[6] The Nebraska Supreme Court in *NECO* recognized an exception to the general rule that fraud cannot be based on predictions in reference to future events. *See NECO*, 597 N.W.2d at 606–07. The Court explained, "fraud may be predicated on the representation that an event, which is in control of the maker, will or will not take place in the future, if the representation as to the future event is known to be false when made or is made in reckless disregard as to its truthfulness or falsity and the other elements of fraud are present." *Id.* Certified has not argued that this exception applies and, therefore, the Court deems any such argument waived. *See Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1022 (8th Cir. 2019) (holding that an argument is waived when not made before the district court). In any event, given that the Summary states that the final cost to Certified will vary depending on *Certified's* future payroll and claims, the final cost was not "in the control of the maker" of the allegedly false statement. Defendants had no control over Certified's payroll or the claims made under Certified's workers' compensation policy.

### D. Declaratory Judgment

In its request for declaratory judgment, Certified asks the Court to enter a declaratory judgment declaring that Defendants are, under the terms of the RPA, "obligated to return additional monies to Certified." Filing 1 at 13. Defendants ask the Court to dismiss Certified's declaratory judgment request because Certified is not entitled to any additional money pursuant to the RPA and because the remedy is redundant. Filing 27 at 26. Certified replies that its request for declaratory judgment is proper because it will settle the legal disputes between the parties and adjudicate the controversy. Filing 38 at 32.

The Declaratory Judgment Act states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C.A. § 2201(a). "It is well established that the Declaratory Judgment Act . . . granted the federal courts discretion 'to make a declaration of rights; it did not impose a duty to do so.'" *Alsager v. Dist. Ct. of Polk Cnty., Iowa (Juv. Div.)*, 518 F.2d 1160, 1163 (8th Cir. 1975) (quoting *Pub. Affs. Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962)). In deciding whether a declaratory judgment is appropriate, the Eighth Circuit Court of Appeals has looked to the guidelines formulated by Professor Borchard:

> The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings. It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed.

*Id.* at 1163–64 (quoting Borchard, Declaratory Judgments 299 (2d ed. 1941)).

The Court agrees with Defendants that Certified's request for declaratory judgment should be dismissed. As to Continental and Applied, the Court has dismissed all the claims against them. They are not bound by the terms of the RPA, and therefore there is no remedy that a declaratory

judgment could provide to Certified. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) (describing the Declaratory Judgment Act as providing "a remedial arrow in the district court's quiver" that creates "an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants"); *Aetna Cas. & Sur. Co. v. Jefferson Tr. & Sav. Bank of Peoria*, 993 F.2d 1364, 1366 (8th Cir. 1993) (holding that a federal court has discretion on whether to exercise jurisdiction over actions only seeking declaratory relief).

Moreover, the adjudication of Certified's remaining breach-of-contract claim against AUCRA would necessarily determine whether Certified is entitled to a declaratory judgment. *See Mille Lacs Band of Chippewa Indians v. State of Minn.*, 152 F.R.D. 580, 582 (D. Minn. 1993) ("A redundant declaratory judgment claim is not a proper declaratory judgment claim and should be dismissed." (citing *Aldens, Inc. v. Packel*, 524 F.2d 38, 51–52 (3d Cir. 1975))). If AUCRA breached the RPA, then AUCRA would be "obligated to return additional monies to Certified." Filing 1 at 13. If AUCRA did not breach the RPA, then it is under no obligation to "return additional monies to Certified." A declaratory judgment against AUCRA would not be useful in "clarifying and settling the legal relations" in this case or "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Alsager*, 518 F.2d at 1163–64. Accordingly, the Court dismisses Certified's request for declaratory judgment.

### E.  Leave to Amend

At the end of Certified's Brief in Opposition to Defendants' Motion to Dismiss, Certified requests leave to amend its Complaint if the Court finds that the Complaint "is in any way

insufficient."[7] Filing 38 at 33. Defendants oppose Certified's request by arguing that any amendment would be futile. Filing 39 at 23.

It is within the court's discretion to grant post-dismissal leave to amend. *See City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 558 (8th Cir. 2021). The court may deny leave if amending a complaint would be futile—meaning that it would not survive a motion to dismiss—or because the moving party failed to offer a proposed amended complaint. *See id.* Denial is also appropriate when a party has failed multiple times to adequately plead its claims. *See Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 758 (8th Cir. 2021).

The Court dismissed Certified's breach-of-contract claim against Continental and Applied because they are not signatories to the RPA. Certified has not explained how, as a legal matter, a nonsignatory to the RPA could be liable for a breach of the RPA. An amendment to revive Certified's breach-of-contract claim against Continental and Applied would be futile because, as nonsignatories to the RPA, they are not liable for breaching it.

The Court also dismissed Certified's misrepresentation claims because the alleged representation in the Summary—the estimated final costs to Certified—was a prediction of a future event that is not actionable. No further factual allegations related to this alleged representation would change the fact that, under Nebraska law, predictions of future events cannot support a misrepresentation claim. Amending the Complaint would not save Certified's misrepresentation claims. Therefore, the Court denies Certified's request for leave to amend its Complaint as futile.

---

[7] The Eighth Circuit Court of Appeals has held that district courts do not abuse their discretion by denying conditional requests for leave to amend when the party fails to provide a proposed amendment with their request. *Soueidan v. St. Louis Univ.*, 926 F.3d 1029, 1036–37 (8th Cir. 2019). Certified did not provide a proposed amendment to the Court.

## IV.   CONCLUSION

The Court dismisses Certified's misrepresentation claims; its breach-of-contract claim against Continental and Applied; and its request for declaratory judgment. Accordingly,

IT IS ORDERED:

1.   Defendants' Motion to Dismiss, Filing 26, is granted in part and denied in part;

2.   Defendants' Applied Underwriters, Inc., and Continental Indemnity Company are terminated from this case.

Dated this 2nd day of May, 2022.

BY THE COURT:

Brian C. Buescher
United States District Judge

24